28039
150
4-1

UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

YVETTE ISKANDER,
        Plaintiff,

v.

BOSTON UNIVERSITY,
        Defendant.

CIVIL ACTION
DOCKET NO.

# 01-10083WGY

## VERIFIED COMPLAINT WITH JURY DEMAND

**INTRODUCTION:**

The plaintiff is a 46 year old native of Egypt, who is in the
United States on a permanent visa.   The plaintiff has a
Bachelor's degree in Pharmaceutical Sciences from Cairo
University (1976), a Master's Degree from North Dakota State
University in Pharmaceutical Science with a major in Immunology
(1992).   She started her Ph.D. at University of North Dakota
Medical School in Microbiology/Immunology.   In 1993 she
transferred to Boston University Medical School, Pathology
department, Immunology major. She was one of several graduate
students admitted to the program from an applicant pool of over
150.   She is a member of Phi Kappa Phi honor society which is
composed of the top (5%) of the nation's students.   She moved to
Boston from North Dakota and lived in a studio apartment without
any family connection in Boston after 1995.   She participated in
department practices which if completed would result in her
Ph.D. Degree. In 1998 after filing many complaints over the
years for a variety of reasons she was dropped from the graduate
program.   The complaint which follows sets forth the legal and
factual claims being made by the plaintiff.

**PARTIES:**

1.   The plaintiff is a citizen of Egypt and a resident of the
     Commonwealth of Massachusetts. Until 1998 the plaintiff was
     a Ph.D. candidate in Boston University Medical School.

2.   The defendant Boston University Medical School is an
     accredited University in the Commonwealth and operates as a
     tax exempt organization.   It has established many programs
     of advanced study and grants advanced degrees to those
     selected to participate in the programs.



3. In 1993 the plaintiff was admitted to the advanced degree program at the Medical School which would in several years lead to a Ph.D. degree.

4. At all relevant times, the plaintiff worked as directed by the supervisory staff of the Medical School. She conducted a variety of tasks for the program and as far as she could tell, met with academic review which was uniformly excellent and was approved to continue her research.

5. The plaintiff was assigned a project which was an investigation of the hypothesis of the effect of drinking black tea on decreasing mammary tumors in rats. Through the effect of black tea on the biomarkers (NF-KB and AhR) which activate the ocogene in the nucleus which is involved in tumor development. The biomarker NF-KB has five subunits(P50 and P65 being investigated).

6. The rats had to be prepared by the plaintiff for the experiments which required that a mammary tumor be induced. The rats were given carcinogens to induce the mammary tumors. That process took approximately two years.

7. After the rats were sacrificed, the tumors were harvested. The plaintiff was called upon to stain many mammary cells and to observe the effect of the ingested black tea in decreasing the Ah receptor and NF-KB biomarkers on the nucleus of the mammary cells. Certain stains would be applied to the mammary cells which would then show the presence of the biomarkers in the nucleus or in the cytoplasm of the mammary cells.

8. The plaintiff after doing a few dozen slides found that there was not enough staining to properly conclude that there was any significance to the hypothesis. In fact it seemed that the rats who ingested black tea developed more tumors than the control group who drank distilled water.

9. She brought this information to her advisor and then to her graduate committee in 1996.

10. The plaintiff had concluded that the work being assigned was without scientific merit and proposed an alternate hypothesis for investigation.

11. The plaintiff then received a notice that she would be disqualified from the Ph.D. program.

12. Her supervisor, Dr. Adrianne Rogers, was angry with the plaintiff's refusal to waste valuable time with the same hypothesis which had been shown to be a dead end.

13. The results that were being presented were the evidence of the biomarkers in the tumor's nucleus. The plaintiff found that the biomarker NF-KB P50 subunit was mainly in the nucleus of the blood cell and NF-KB P65 subunit was biologically and statistically insignificant in the mammary tumor cell. The staining protocol was incorrect because it caused overstaining with the possibility of false positives.

14. In addition the plaintiff had discovered that the staining protocol for AhR was also incorrect. She had been directed to stain it for only one hour, and learned that the correct procedure was 24 hours according to scientific publications. Both Dr. Shi Yang and Dr. Rogers rejected the plaintiff's concerns about the improper procedure. No explanation was given other than she could remove herself from the laboratory which meant the end of the Ph.D. program.

15. The plaintiff argued with Dr. Rogers and Dr. Yang and realized that her work was in vain. She had committed three years and did not want to lose her opportunity to earn her Ph.D. Degree. Her alternate hypothesis was rejected, and she was assigned once again to the same useless work as before.

16. The plaintiff then learned that her rejected proposal was in an area which would yield two Ph.D. degrees for two other students in the same department.

17. For reasons which are inexplicable the University allowed the plaintiff to continue with the task given to her, see attached exhibit "A".

18. The graduate committee of the medical school failed to realize that the task given to the plaintiff was without any positive controls, and had already been unsuccessful with findings which were no more significant than random phenomenon with no statistical or biological validity. In addition the results of the animal experiments showed that drinking black tea had no significant effect in suppressing mammary tumor development. Contrary to the hypothesis, the first experiment demonstrated that drinking black tea caused

significant increases in tumor development than the control group that was given distilled water to drink.

19. The protocols of the experiments were dictated by the Drs. Rogers and Yang.  Many objections by the plaintiff were rejected.

20. In late 1997 the plaintiff learned that her research was being used as part of a breast cancer research project funded by the United States Army at the University.

21. The plaintiff became concerned because the conclusions being drawn in the study and by her supervisors were unsupported by her experiments and data.

22. The plaintiff again brought her concerns to her supervisors and found that the response was becoming personally negative, and that her ability to gather information and draw conclusions were being questioned and her competence was at issue.

23. The plaintiff was instructed by Dr. Rogers to compare the research data from the U.S. Army study with the plaintiff's data.  The plaintiff discovered that the U.S. Army data was nonspecific for NF-KB subunits and the plaintiff's research was for NF-KB P65 subunit.  Dr. Rogers had assumed that the U.S. Army data was for a NF-KB P50 subunit which it was not. The plaintiff was sent down a false path because of Dr. Rogers' negligence.

24. The proposal, hypothesis and data assigned by Dr. Rogers were undefendable.

25. The plaintiff was once again disqualified from the program, and after two investigations by the University was dismissed from the Ph.D. program.

26. The plaintiff at relevant times conducted her research as directed and drew scientifically valid conclusions which was that the research was futile.

27. The employees of the University conducted a series of experiments with outside funding which turned out to be scientific dead ends.

28. The University used the cultural naivete of the plaintiff to disguise the activities of the employees of the University

to engage in activities for profit, for publication and for the prestige of the University.

COUNT I
Breach of Contract

29. The plaintiff realleges paragraphs 1 - 28 as if set forth fully here.

30. The plaintiff was a qualified student when she was accepted at Boston University's Graduate Program in Immunology/Pathology.

31. The plaintiff made a commitment of several years to the program and in exchange agreed to spend between 80 - 100 hours per week in study and laboratory experiments.

32. She relied upon the representation of the defendant that it would provide guidance and encouragement in achievement of scientific and academic goals which set forth in the course requirement.

33. The plaintiff was required to create an environment for approximately 200 animals in which she would monitor and care for the animals in an experiment which had as its genesis a contract with the Tea Trade Research Association and a matter investigating the validity of research results achieved by another researcher who used molecular techniques.  The plaintiff was to use immunohistochemistry methods.

34. After the animals were euthanized and the tumors were analyzed by a variety of means to see the effect of drinking black tea on the biomarkers, the plaintiff concluded that the marker she was looking for (NF-KB P65) was not in the nucleus of the mammary tumor cells.  Additionally it appeared that the result of the first experiment of laboratory animals in fact had more incidents of mammary cancer drinking black tea than the control group drinking distilled water.

35. When this information was given to Dr. Rogers  she did not order the experiment concluded. She had the plaintiff go through over 1,500 slides to no observable difference or variation of any significance.  This process took two years with the animals and another two years with the immunohistochemistry.

36. The defendant had an obligation to provide the environment
    and information which could be used by the plaintiff to earn
    her degree.

37. It became clear to the plaintiff that she was not taken
    seriously, and had fully committed to a program which seemed
    to be run for purposes of grant research which was entirely
    separate from any purpose other than to fund the university
    on the backs of the talent and energy of the graduate
    students.

38. The university moved against the plaintiff in 1996 and then
    relented and put her back on the same project which bore a
    relationship with a parallel investigation funded by another
    source.

39. The hypothesis given to the plaintiff was not a legitimate
    task.  The protocol was firmly in hands of the defendant who
    would not modify and change the parameters or the staining
    guidelines.  The plaintiff was told to do the same task over
    and over in a futile hope that after x number of slides
    (approximately 1500 slides) some scientific significance
    would attach.  It never did.

40. Dr. Rogers knew or should have known that the hypothesis
    given in 1997 was proven to be false.  Dr. Rogers'
    assignment of the same hypothesis in 1998 was deliberate and
    intentional, and Dr. Rogers knew or should have known that
    the hypothesis was undefendable. Dr. Rogers proposed that
    the plaintiff compare her P65 subunit research with the
    research of another student allegedly working in P50 subunit
    without realizing that the other student was working in
    undifferentiated NF-KB.  This was brought to Dr. Rogers
    attention when the plaintiff was unable to defend it.

41. The plaintiff as a graduate student made known her concerns
    about the pointless task she was assigned to the pathologist
    members of graduate committee.  After hearing her complaints
    and seeing the slides which proved the non-viability of the
    hypothesis nothing was done.

42. Upon information and belief the plaintiff alleges that the
    university had its economic interest in its grant
    solicitations as its primary scientific interest and not the
    obligation and duty to the plaintiff.

43. The university breached its contractual obligation to the plaintiff much to her loss.

COUNT II
Tortious Interference

44. The plaintiff realleges paragraphs 1 - 43 as if fully set forth here.

45. Medical and scientific research has become big business. The line between profit making and non-profit institutions has been crossed by the university.

46. The scientific objectives are often purely research or are the mapping of a subject for later analysis.

47. The qualifications of the plaintiff in this endeavor were amply demonstrated in her previous research at North Dakota State University.

48. The legitimate expectations of the plaintiff and the promises made to the plaintiff by the university were breached by the behavior of Dr. Rogers and by the university.

49. The statements made to the university by Dr. Rogers were false and were an attempt to hide the incompetence of the administration or alternatively the mixed financial agenda of the university.

50. The statements and the actions of the university in removing the plaintiff from the graduate program were intentional and undertaken in bad faith.

51. As a result of the misdirection and false charges and evaluations made by the university its agents and employees the duty of fair dealing and honesty was breached with the plaintiff.

52. The plaintiff was harmed by actions of the defendant its agents and employees.

COUNT III
Negligent Supervision

53. The plaintiff realleges paragraphs 1 - 52 as if set forth more fully here.

54. The plaintiff relied upon the representations of the university that it was engaged in serious scientific research and would assign tasks and duties which would in the normal course result in the granting of a Ph.D. degree.

55. From almost the inception of the program the plaintiff found herself working on pointless and time consuming duties related to the grant gathering of the university as interpreted by Dr. Adrianne Rogers.

56. From the beginning of her analysis of the data from the laboratory animals it was clear to the plaintiff that she was on a wild goose chase. That information was communicated with data, slides and charts. Dr. Rogers either could not or would not admit that the inquiry should have been abandoned.

57. Dr. Rogers would not relent from her requirement that the plaintiff continue to conduct slide analysis and prepare charts of scientific data which never materially varied.

58. The plaintiff came to understand, in the course of her dealings with Dr. Rogers, that Dr. Rogers had little or no knowledge of immunohistochemistry or the procedures to establish the staining protocol and parameters. Dr. Rogers basically was orienting the research of the plaintiff to support institutional goals without allowing the plaintiff to properly pursue the science of her training.

59. It would appear that the plaintiff was not properly supervised or advised.

60. It would appear that the plaintiff was required to follow the directions and advice of Dr. Rogers much to her detriment.

61. The university knew or should have known that the limitations of Dr. Rogers would cause the failure of the efforts of the plaintiff.

62. The plaintiff was harmed as a result of the improper
supervision of both Dr. Rogers and the university.

COUNT IV
Promissory Estoppel

63. The plaintiff realleges paragraphs 1 - 62 as if set froth
more fully here.

64. The plaintiff was induced to come to the university because
it represented itself as a prestigious and challenging
scientific environment.

65. The plaintiff relied upon the promises of the university
that she would obtain experiences and practical methods of
inquiry at the university which with her studies would
result in a Ph.D. degree.

66. The plaintiff did all things required of her, and discovered
that the university is an academic environment which is
grant driven and results in supervision by acadamdecians
whose only concern is academic politics and financial grants
which allow the department to continue in research which has
little or no useful application.

67. When the plaintiff brought her concerns to Dr. Rogers the
result was hostile and intimidating.  Further recourse to
the hierarchy in the department confirmed that nothing would
be done, and the plaintiff had better do as she was told.

68. The plaintiff discharged essentially all of the duties
placed on her as a graduate student, and relied upon the
promises of the university to her detriment.

69. The defendant has failed to perform the proper evaluation of
the plaintiff's work, or even assign her meaningful
assignment which could in due course lead to a degree.

COUNT V
(Slander)

70. The plaintiff realleges paragraphs 1 - 69 as if set forth
more fully here.

71. The defendant has engaged in a business of evaluating and
certifying individuals for advancement in the academic and
professional fields.

72. The process employed by the university and the resultant decision to remove the plaintiff has been broadcasted by the university its agents and employees much to the detriment of the plaintiff.

73. The university has engaged in a concerted cover-up of as yet undisclosed financial incentives to investigate NF-KB.

74. The plaintiff objected to the gross distortion of the research which revealed little or no real connection between black tea and mammary tumors in rats.

75. The defendant engaged in questionable research and then when they were confronted with the serious holes in the scientific basis by the plaintiff responded by punishing the plaintiff and circulating information and pointed letters to besmirch the reputation of the plaintiff.

WHEREFORE, the plaintiff prays that this honorable court will:

a. Enter judgment on all counts and award damages to the plaintiff, and

b. Such other legal and equitable relief as this court deems just including compensatory damages, attorney's fees and costs, where appropriate, and

c. Punitive damages where the plaintiff shows that the negligence was a result of deliberate act or in the furtherance of an organizational purpose beyond the scope of the educational charter of the defendant.

YEVETTE S. ISKANDER

By her Attorney,

Cornelius J. Sullivan
BBO 485160
Sullivan & Walsh
51 Ellison Avenue
Mattapan, MA 02126-2803
(617) 296-0552
FAX (617) 296-0005

VERIFICATION

This date I, Yvette S. Iskander, did read the foregoing Verified Complaint with Jury Demand and the facts set forth are true the best of my knowledge and ability.

_1/16/01_ -

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                              January 16,2001

This date Yvette S. Iskander, appeared before me and acknowledged the foregoing Verification to be her free act and deed and that the Verified Complaint was true to the best of her knowledge and  was subscribed to under the pains and penalties of perjury.

Cornelius J. Sullivan
Notary Public
My Commission Expires 6/30/06